AMERICAN BANK & TRUST COMPANY *v.* FIRST NATIONAL BANK OF PARIS.

Opinion delivered November 16, 1931.

690

*Rhyne & Shaw* and *Hays & Smallwood*, for appellant.

*Evans & Evans*, for appellee bank.

*Leora Blair, pro se.*

BUTLER, J. The appellee bank filed an action in the chancery court of Logan County for judgment against Thomas B. Harris on a note executed by Harris to the bank, and for foreclosure of a mortgage given to secure the same and executed and filed for record on December 24, 1926. Appellee bank alleged among other things that appellant bank and trust company was claiming some interest in the property secured by the mortgage, and asked that it be made a party to the action. The bank and trust company answered, alleging that Harris was indebted to it for a balance on a note of $9,644 to secure which he had executed a mortgage in favor of the bank and trust company, which mortgage included the property named in the mortgage from Harris to the appellee bank, as well as certain other property located in the town of Paris. This mortgage was executed and filed for record on February 9, 1925. The bank and trust company made its answer a cross-complaint against the appellee bank, and Harris, and asked for judgment for the balance claimed, and that its mortgage be declared prior and paramount to that of the appellee bank, and prayed for foreclosure.

Thereafter, the appellee, Leora Blair, having obtained permission of the court, filed an intervention by

which she claimed that on December 4, 1925, Harris and wife were indebted to T. C. Blair, the debt being evidenced by a note and mortgage executed to the said Blair by which it conveyed certain town lots in the city of Paris included in the mortgage executed on March 9, 1925, to appellant bank and trust company. She alleged that this note and mortgage had been assigned to her, and asked that her rights be adjudicated, alleging further, as also did the appellee bank in its reply to the cross-complaint of the appellant bank and trust company, that the note given by Harris to said bank and trust company had been paid, and that the cross-complaint should be dismissed.

After having heard the evidence on the issues raised by the above pleadings, the chancellor found in favor of the appellees, and that the indebtedness secured by the mortgage set up in the cross-complaint of the bank and trust company had been paid, and that the lien of said mortgage had been satisfied. The court dismissed the cross-complaint as to its asserted rights under the mortgage for want of equity.

It was established by the evidence that in 1923 Harris borrowed $2,500 from the appellee bank and gave his note to evidence the transaction with Lewis C. Sadler as security thereon, executing to Sadler a mortgage on a small farm near Paris to secure Sadler from loss and to protect and save him on any renewals of the note, provided that, if Harris should pay the money borrowed when due, the mortgage should be void, etc. This note was extended from time to time in consideration of payments of interest made and indorsed thereon; the due date of the original note being January 2, 1924. This note and mortgage remaining unpaid, the note sued on by appellee bank was given in renewal on the 24th of December, 1926, and a new mortgage including the same property was executed by Harris to the appellee bank direct, but the original note and mortgage given to Sadler were not canceled or satisfied.

In the beginning of the year 1925, Thomas B. Harris, a brother-in-law, W. M. Quaile, and Guy O'Kelly pur-

chased a mercantile business located in the city of Paris, and Harris applied to appellant for a loan of $9,000 with which to pay for his third interest in the business purchased. This loan was approved, the interest to the amount of $600 was included in the note which was executed on March 9, 1925, for the sum of $9,600, to secure which Harris executed the mortgage set out in the appellant's cross-complaint. At that time the mortgage from Harris to Sadler and the debt secured thereby were still subsisting, of which fact the cashier of the appellant bank who handled the transaction had actual notice. The mortgage required by appellant included the mercantile business for which the money was borrowed, several town lots in the city of Paris, and also the small farm which had been mortgaged to Sadler as aforesaid.

Leora Blair, the appellee, loaned Harris, through her brother, T. C. Blair, $1,600; to secure which the note and the mortgage on some town lots was given as set up in her intervention.

A number of questions are presented by counsel in their respective briefs which will be unnecessary to consider, for in our view of the case a decision of only two questions is necessary to a determination of the issues.

It was shown by the evidence that Harris, prior to the date of purchase of the third interest in the mercantile business, was indebted to appellant bank on a note for which he was surety in the sum of $1,053.33, and two other smaller notes amounting to about $126. From February 9, 1925, down to, and including, August 16, 1926, he made a number of small notes, discounting others which he owned and which, not being paid, were charged back to his account. All these amounted to about $4,500. At and during the time of the purchase by Harris of the one-third interest in the mercantile business, he seems also to have been engaged in the insurance business, but in the year 1925 his health became bad, and he had to go to a hospital on several occasions and so concluded to sell his interest in the mercantile business. He induced his father-in-law, Mr. Quaile, to buy it, who, on March

9, 1926, in payment of the same, executed a note payable to appellant bank in the sum of $9,789.74, which note he afterwards paid.

■ It is the contention of the appellees that the transaction last referred to was a payment of the $9,600 note made by Harris to appellant and secured by mortgage. Appellant contends first that the $9,600 note was not paid, but that when Quaile executed his note for $9,-789.74, there was no direction given as to what debt the proceeds should be applied, and therefore appellant had the right, and did, make application first to the payment of the small notes, crediting the residue on the $9,600, leaving a substantial amount of that note unpaid. Second, appellant contends that, even though the $9,600 note was paid, the mortgage given by Harris on February 9, 1925, was security not only for that note but also for all indebtedness incurred by Harris from its date to the time due, and that therefore its mortgage still subsisted, and it was entitled to have its mortgage declared paramount to the mortgages of the appellee, and to foreclosure in satisfaction of that indebtedness.

Reed, the cashier, testified in positive terms that Harris not only did not direct that the $9,600 note was to be paid, but expressly agreed that the payment made by Quaile was to be applied, first, to the "small notes and get them out of the way, and apply the balance to that covered by this mortgage"; that the understanding was that he was to take up "all of his little stuff and leave one note—get that all out of the way and apply the balance to the one big note which was covered by the mortgage." This testimony was contradicted by the testimony of Harris and of Mr. Quaile and by the attendant circumstances. Harris repeatedly stated during the nine times he was examined and cross-examined by the attorneys that he never at any time had any specific agreement or made any specific direction as to what should be done with the proceeds of Mr. Quaile's note, but that it was understood "between me, Mr. Quaile, Mr. O'Kelly and Mr. Reed that Mr. Quaile was taking up my interest in the business. So far as to Mr. Reed applying it, where he

applied it, I don't know. I didn't give him authority to apply it anywhere else. I didn't specify him to apply it anywhere.''

Quaile testified that, after he had agreed to buy Tom Harris' interest in the store, he told Mr. Reed that he wanted to pay Tom Harris' note; that Reed figured up the amount of the note with the accrued interest and accepted the note of Quaile for that amount (which note Quaile afterward paid); that ''he (Reed) figured it up, and I gave my note, and I said, 'You take my note and relieve Tom.' He said: 'All right, I will do that','' and the circumstance that the note taken from Quaile was for the exact amount of Harris' $9,600 note strongly corroborates the contention of Harris and Quaile, especially as Reed admitted that when he made the loan to Harris it was for the purpose of enabling him to buy in the business; and that he knew what the money was first borrowed for and knew what Mr. Quaile was paying the money for —''to take up that indebtedness.''

The chancellor resolved the conflict in favor of the appellees, which finding we are not inclined to disturb, for, as we view the testimony, there was in fact a general understanding between Reed, Harris and Quaile that the proceeds of the latter's note were to be used only for one purpose, namely, to pay the $9,600 note, and no specific direction was required.

■ Reed testified that it was the understanding that the indebtedness incurred by Harris after February, 1925, and after the execution of the mortgage to appellant was to be included in the mortgage security, and stated that he advanced those amounts to Harris on account of the mortgage, and that he would not have advanced the same if he had not had the mortgage. This testimony was given in answer to questions propounded by his attorney which were suggestive of the answers, but other parts of his testimony indicated that he did not consider any of the small notes included within the mortgage, for, in speaking of the application he made of the money from Quaile, he said that he took up the little

notes and applied the balance "on the one big note covered by the mortgage"; and later on in his testimony he uses practically the same expression, and before that, in testifying as to the alleged agreement made with Harris as to the application, he stated that they would take up the small notes and apply the balance on the note "covered by the mortgage." At the time of the execution of the mortgage Harris was already indebted on one note in excess of 1,000 and two smaller notes, and it is likely that, had it been the intention to include any other amounts than the $9,600 note in the mortgage security, these notes would have been included.

It is argued that the intention is shown because Harris did not specifically deny the statement made by Reed. Throughout his entire testimony it is apparent Harris thought the only note secured was the $9,600. So, as between the parties, it is doubtful whether there was any such intention as claimed by Reed, but whatever might have been the intention, this could not affect third parties to the transaction for as to them the intention must have been shown by the plain terms of the mortgage itself.

One may execute a valid mortgage to secure a debt to be contracted in the future (*Jarrett* v. *McDaniel,* 32 Ark. 598; *Fort* v. *Black,* 50 Ark. 256, 7 S. W. 131) but, in order to do so, there must be an unequivocal agreement in the instrument itself that it is given for debts to be incurred in the future. *Martin* v. *Holbrooks,* 55 Ark. 569, 18 S. W. 1046; *Greeson* v. *German Nat. Bank,* 78 Ark. 141, 95 S. W. 439.

"The effect of our cases is that a mortgage to secure future advances * * * is valid, but, if such purpose is intended to be accomplished, that fact must clearly appear from the instrument, and such purpose will not be presumed where the instrument does not contain a general description of the indebtedness secured so as to put one who examines it on notice that this was its purpose in order that such person may pursue the inquiry which such knowledge would suggest." *Word* v.

*Cole,* 122 Ark. 457, 183 S. W. 757; *Patterson* v. *Ogle,* 152 Ark. 395, 238 S. W. 598.

The circumstances attendant upon the execution of the mortgage and the nature of the transaction subsequent thereto are always matters of consideration in determining the effect of the mortgage, and, as these circumstances and the language of the instruments vary "each case (as said in *Patterson* v. *Ogles, supra*) on this subject calls for an interpretation of the language of the mortgage so as to determine whether the description falls within the rule announced above."

As we have seen, the primary purpose of the execution of the mortgage to the appellant was to secure a note given by the mortgagor for money loaned for the purchase of an interest in a mercantile business. The mortgage in express terms secured only Harris' note for $9,600, the amount of the purchase price. The language of the mortgage which appellant interprets as security for debts incurred by Harris after the execution of the mortgage is found in its defeasance clause: "Now, if the said T. B. Harris and Susanna Harris shall pay said money at the time and in the manner aforesaid, together with renewals, extensions or advances, then the above conveyance shall be null and void."

This court, in *Thompson* v. *Reaves,* 170 Ark. 409, 279 S. W. 1011, under the particular facts of that case, held, as between the parties, that the future advances might be secured by reference to such only in the defeasance clause, but its language was essentially different from that of the mortgage in the instant case, the condition being that if the mortgagor should "pay said note or any renewals thereof at the time same fall due and all other indebtedness above provided for, then this deed is to be void." The mortgagee in that case conducted a general mercantile business, the mortgagor was a farmer, and it appears that the advances made were for such as would be ordinarily made by a merchant to a farmer, and were clearly referable to the specific obligations.

Appellant has cited the case of *Jones* v. *Dowell*, 176 Ark. 986, 4 S. W. (2d) 949, as authority for its contention that the defeasance clause in the mortgage was sufficient to cover future advances, but in that case the court said: "But whether it included the advances or not appears to be immaterial in this case." In order for future advances to come within the terms of the mortgage, that purpose must be unequivocally stated, and, unless the nature of such are otherwise clearly defined, they must bear some relation to the subject-matter for which the primary debt is incurred and which the mortgage is given to secure. *Whitener & Lark* v. *Beebe*, 12 Ark. 581; *Briggs* v. *Steele*, 91 Ark. 412-3, 121 S. W. 754; *Martin* v. *Halbrook; Gleason* v. *German Nat. Bank;* and *Word* v. *Cole, supra; Berger* v. *Fuller*, 180 Ark. 372, 21 S. W. (2d) 419.

In the case at bar the primary debt was incurred for the purchase price of a third interest in a mercantile business, and the debts subsequently contracted are not shown to have had any relation to the conduct of that business. Some of the subsequent indebtedness seem to have been notes which Harris had taken in payment of insurance premiums, discounting same at the bank, which were not paid when due and were accordingly charged back to his account. The other notes were personal notes of Harris, and had no apparent connection with the mercantile business.

Where one contracts in good faith with a debtor that the security given should include not only that specifically mentioned in the mortgage but other indebtedness, whether existing then or to be incurred in the future, it is not difficult to describe the nature and character thereof, so that both the debtor and third parties may be fully advised as to the extent of the mortgage. Sound policy demands no less. Especially is this true where the terms of the mortgage are sought to be extended by means of the language of the defeasance clause, which is usually at the end of the mortgage and, in the

698

prepared forms commonly in use, is in small type which escapes all but the closest scrutiny.

In the instant case the language is equivocal, and, applying to it the rules announced, we are of the opinion that it did not include within the security any indebtedness owing by Harris to the appellant except that specifically mentioned, and, since the chancellor found that this had been paid, the mortgage lien was by that fact discharged. It follows that the decree of the trial court is correct, and must therefore be affirmed. It is so ordered.