**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Robert D. PLANT and wife, Lorrayne**
**Plant, d/b/a Big Little Sand and**
**Gravel Co., Defendants.**

**Civ. A. No. 840.**

United States District Court
W. D. Arkansas,
Hot Springs Division.
Aug. 29, 1962.

Charles M. Conway, U. S. Atty., Robert E. Johnson, Asst. U. S. Atty., Fort Smith, Ark., for plaintiff.

John L. Wilson, Jr., Hope, Ark., for Robert D. Plant and wife.

Boyd Tackett, Texarkana, Ark., for Crabtree.

Keith, Clegg & Eckert, Magnolia, Ark., Don C. Phelps, McAlester, Okl., for J. G. Puterbaugh.

JOHN E. MILLER, Chief Judge.

On January 31, 1961, the plaintiff filed its complaint against the defendants, Robert D. Plant and wife, Lorrayne Plant, to obtain a judgment against defendants for the balance due on (1) a promissory note in the sum of $40,000 dated June 3, 1957, executed and delivered to the Bank of Prescott, Prescott, Arkansas, the payment of which was secured by chattel mortgage on certain personal property of even date, which mortgage and note were assigned to the Small Business Administration on September 7, 1960; (2) a promissory note in the principal sum of $20,000 executed October 7, 1958, payable to the Small Business Administration, and secured by chattel mortgage of same date on certain personal property therein described; and (3) a promissory note in the sum of $65,000 payable to Small Business Administration, dated May 27, 1957, the payment of which was secured by a non-negotiable warehouse receipt issued by the St. Louis Terminal Field Warehouse Company for 97,500 tons of washed gravel. The warehouse agreement had been entered into by the defendants Plant

and wife, d/b/a Big Little Sand and Gravel Co.

Simultaneously with the filing of the complaint, C. W. Ferguson, Regional Director of Region X, Small Business Administration, executed and filed an affidavit, in which he stated that the defendants Plant and wife, d/b/a Big Little Sand and Gravel Co., "are about to remove, or have removed, their property, or a material part thereof, out of this state, not leaving enough therein to satisfy the plaintiff's claim, or the claim of said defendants' creditors."

The affiant further stated that the amount due the plaintiff at that time was $107,955.63, together with interest thereon, and "that he ought, and he verily believes to recover thereon the sum of $107,955.63 with interest thereon, all as alleged in the original complaint on file herein, for which he has a lien on personal property described in Exhibits 'B', 'D', and 'F' in his complaint by virtue of the mortgages and pledges therewith exhibited; and affiant has reasonable cause to believe, and does believe, that, unless prevented by the court, the property will be sold, concealed, or removed from the state." The Exhibits B, D and F are the two mortgages hereinbefore referred to and the original nonnegotiable warehouse receipt referred to.

Upon the filing of the affidavit a writ of attachment was issued and served on February 3 and 8, 1961. Under the writ the Marshal took charge of all the personal property described in the mortgages "including the gravel."

On March 23, 1961, R. M. Crabtree, for an express consideration, executed an agreement for assumption of the indebtedness owed by the defendants Plant, d/b/a Big Little Sand and Gravel Co.

On May 3, 1961, the plaintiff filed a motion to quash writ of attachment "as defendant has made arrangements for paying the indebtedness outlined in plaintiff's complaint." An order quashing the writ of attachment and releasing all of the property therefrom was entered on the same date.

On March 27, 1962, plaintiff filed an amendment to the complaint and made several other parties defendant, including R. M. Crabtree, who had on March 23, 1961, for a good and sufficient consideration assumed the payment of the indebtedness.

On March 6, 1962, prior to the filing by plaintiff of the amendment to its complaint, the defendants Plant and wife filed a petition "for permission to plead," in which they alleged:

"That the parties to said suit reached an agreement and as a result of said agreement the lawsuit was held in abeyance; that several months have passed during which the parties to this lawsuit abided by the agreement to hold the suit in abeyance; and

"That recently the plaintiff has sought to move again in said lawsuit and this defendant desires permission from this honorable court to file any pleadings that he might deem pertinent."

Permission was granted the defendants to plead, and on March 19, 1962, they filed their answer and "cross complaint." In the "cross complaint" the defendants Plant alleged:

"That in the foreclosure of the securities mentioned in the complaint of the plaintiff all of the gravel in the possession of defendants was tied up instead of the amount of gravel on which plaintiff acting through the Small Business Administration had a mortgage (namely ninety-seven thousand five hundred tons of washed gravel); this defendant further states by way of cross-complaint that instead of tying up only the ninety-seven thousand five hundred tons of washed gravel on which plaintiff had a mortgage, the entire amount of washed gravel consisting of some two hundred and fifty thousand tons was tied up and the entire operation of the defendants was brought to a standstill and was held at a

standstill for some period of months to the detriment of said defendants and caused them to lose profits on sales that would have amounted to Two Hundred and Fifty Thousand Dollars ($250,000.00)."

On May 22, 1962, the plaintiff filed its motion to dismiss the counterclaim of the defendants Plant, d/b/a Big Little Sand and Gravel Co. and alleged that the court was without jurisdiction to determine said counterclaim.

On June 12, 1962, after consideration of the motion to dismiss the counterclaim, the court entered an order which, omitting the formal parts, is as follows:

"It is ordered and adjudged that the said counterclaim (cross-complaint) be and is treated as a plea for set-off, and that the said motion to dismiss the counterclaim (cross-complaint) of the defendant be and is overruled."

During all of this time the other parties who had been made defendants by the amendment to plaintiff's complaint had filed various pleadings, counterclaims and cross claims against each other, but none of them asserted any claim against plaintiff except J. G. Puterbaugh, who denied that the plaintiff had a lien upon any gravel other than the 97,500 tons of washed gravel covered by the warehouse receipt.

Upon examination of the file it appeared to the court that the case was getting out of hand and the court was without jurisdiction to adjudicate many of the claims and counterclaims made by the additional defendants. Accordingly, the court on its motion ordered a full pretrial conference to be held in Hot Springs, Arkansas, on June 27, 1962. On that date most of the parties appeared in person and all of them appeared by attorneys. As a result of the conference, the issues to be tried were narrowed and all parties agreed that the issues to be tried were as follows:

"(1) The issue between the plaintiff and the defendant Plant on the questions arising from the set-off that is pleaded by the defendant Plant;

"(2) The issue or issues between the plaintiff and the defendants Puterbaugh and Plant as to the interest acquired by the plaintiff in the gravel involved, and the Lewis lease; and

"(3) The issues between the defendants Puterbaugh, Crabtree, and Plant, as to the amount of the indebtedness, if any, due the defendant Puterbaugh."

By agreement the case was transferred from the Hot Springs Division to the Fort Smith Division and set for trial on August 7, 1962, on the above stated issues. The trial proceeded upon the separate issues, and at the conclusion of the trial the court requested the attorneys for the parties involved to submit memorandums in support of their respective contentions. The memorandums have been received and have been considered along with all of the testimony and pleadings.

While the issues were tried separately, it appears to the court that issue (1) and issue (2) are interrelated, particularly in reference to the claim of plaintiff for a lien upon all the gravel situated on the Lewis lease. The defendants Puterbaugh and Plant admit that the plaintiff has a lien upon 97,500 tons of washed gravel covered by the warehouse receipt, but contend that the plaintiff had no lien upon the gravel other than the amount covered by said receipt.

It was admitted at the trial that there was due the plaintiff on that date the sum of $120,112.61 balance on the three promissory notes and for certain payments made by plaintiff to the St. Louis Terminal Field Warehouse Co., and that the plaintiff has a paramount and prior lien upon all of the personal property described in the two mortgages and upon the 97,500 tons of washed gravel.

The plaintiff claimed and now contends that it not only has a lien upon the personal property particularly described in the mortgages and the 97,500

tons of washed gravel covered by the warehouse receipt, but that it also has a lien upon all the other gravel that was situated on the Lewis lease and owned by the defendants Plant.

The plaintiff bases its claim to a lien upon the excess gravel under the provisions of the mortgages. In the mortgage executed by Plant to the Bank of Prescott, and subsequently assigned to plaintiff, the property included in the mortgage was described as follows:

"(a) All machinery, equipment, furniture, fixtures and personal property of every kind and description owned by Mortgagor and used, or acquired for use, in the operation of Mortgagor's heavy construction and sand gravel business constituting a part of the operating equipment of said construction business, including (without limiting the generality of the foregoing) the following:"

Then follows a description of the various items of property. The mortgage further provides that it covers:

"(b) All machinery, equipment, furniture, fixtures and personal property of every character which might be used or useful in the operation of Mortgagor's heavy construction and sand gravel business aforesaid, including particularly all items similar to those listed in the foregoing subparagraph (a), at any time hereafter acquired by the Mortgagor; this mortgage being intended to cover all such machinery, equipment, furniture, fixtures and personalty owned by Mortgagor, and also all property of such character hereafter acquired by the Mortgagor at any time prior to the foreclosure of this mortgage."

The mortgage executed by the defendants Plant on October 7, 1958, particularly describes certain personal property and in subparagraph (c) provides:

"(c) All machinery, equipment, furniture and fixtures of every kind and description owned by mortgagor and used, or hereafter acquired for use in the operation of Mortgagor's gravel, sand and contracting business or constituting a part of the operating equipment of said business, including (without limiting the generality of the foregoing) the following:

"All business done under name of 'Big Little Sand and Gravel Co.' a trade name, and/or Robert D. Plant."

In subparagraph (d) it is stated:

"(d) All machinery, equipment, furniture and fixtures of every character which might be used or useful in the operation of Mortgagor's said business, including particularly all items similar to those listed in the foregoing sub-paragraph (c), at any time hereafter acquired by the Mortgagor; this Mortgage being intended to cover all such machinery, equipment, furniture and fixtures owned by Mortgagor at any time prior to the foreclosure of this Mortgage."

Both mortgages have future advance clauses, and the plaintiff insists that in view of these "dragnet" provisions, the lien of Small Business Administration attached to the stockpile of gravel at the time of its acquisition under the rule pronounced in Fahrenkamp v. Duncan, Dieckman & Duncan Mining Co., (W.D. Ark.1962) 205 F.Supp. 921; Archer-Daniel-Midland Co. v. North Arkansas Milling Co., Inc., (W.D.Ark.1961) 205 F. Supp. 524.

At the time the chattel mortgage was executed that was under consideration in the Fahrenkamp case, supra, the C.I.T. Credit Corporation held title to the Caterpillar loaders by assignment, and the Merchants National Bank, Automobile Department, Fort Smith, Arkansas, held by assignment the title to the Ford loader equipment. However, the equipment was in the possession of the defendant corporation and used by it in its mining operation. This particular equipment was not specifically described in the mortgage

probably for the reason that the title was not vested in the corporation at that time. There the United States in its intervention contended that the plaintiffs did not acquire under the mortgage a lien upon the equipment that was not specifically described in the mortgage, but at the time the mortgage was executed the particular Caterpillar loaders were in possession of the mortgagor and was equipment of the kind and character used by the corporation in connection with its mining operations. The particular provision in the mortgage that was under consideration read, "together with all equipment of any kind and character used in connection therewith, and all additions, betterments and repairs made or to be made to or upon said property."

At page 926 of the opinion in 205 F. Supp., this court said:

"The court is of the opinion that under the terms of the 'dragnet' clause hereinbefore set forth that it was the intention of the parties to the mortgage to include all the equipment that was added to or used in the mining operations, and therefore must conclude that the lien of the mortgage extended to and covered the equipment."

The facts in Fahrenkamp and the facts in the instant case are not similar, and the rule announced by the court in Fahrenkamp does not apply under the facts in the instant case.

In the Archer-Daniel-Midland Co. case, supra, the only question involved was whether the "dragnet" or future advance clause was sufficient to secure certain advances that had been made to the mortgagor by mortgagee subsequent to the execution of the mortgage.

In the instant case the question is whether the mortgages covered and included the excess gravel.

In further support of the contention the plaintiff introduced in addition to the documents hereinbefore referred to the certificate of deposit executed by Plant to the warehouse company on May 26, 1959, and the original nonnegotiable warehouse receipt, as PX 7; Field Warehousing Agreement, PX 8; Field Warehouse Lease, PX 9; bills of sale of gravel executed by V. B. Lewis and Carolyn Lewis to Plant, as PX 10 and 10½; Lease Assignment executed by Lewis and wife to R. D. Plant, PX 11; assignment of real estate lease and agreement by Plant to the Small Business Administration, PX 12 and 12A; and supplemental loan agreement by Plant, PX 13.

The court has considered all of the exhibits and the contention of plaintiff, but cannot agree that the plaintiff acquired a lien upon any gravel in excess of the 97,500 tons covered by the warehouse receipt. Certainly if the parties had intended that the mortgages should cover more than the 97,500 tons of washed gravel, the same would have been specified with some degree of certainty in the mortgages. Under no construction of the clauses in the mortgages can it be held that the excess gravel was machinery or equipment used in the business. See, 10 Am.Jur., Chattel Mortgages, Sec. 130, p. 799. At the most it is only the product of the use of the equipment covered by the mortgages.

Mr. C. W. Ferguson, who executed the affidavit upon which the writ of attachment was issued, testified that he considered that the Government only had a lien on the 97,500 tons of gravel, which had a value of $1.00 per ton; that in requiring a pledge of the 97,500 tons of gravel, the Small Business Administration was undertaking to obtain an additional security of one and a half times the loan of $65,000, and it calculated the 97,500 tons to be worth one and a half times the sum of $65,000. In addition to the above facts, when the plaintiff commenced its suit, it only sought judgment on the three notes and for a foreclosure of the liens created by the two mortgages and the warehouse receipt. No mention was made of any claim upon the gravel in excess of the 97,500 tons. Therefore, the plaintiff did not acquire a lien upon the gravel in excess of the 97,500 tons.

This brings the court to a consideration of the claim of defendants Plant for an offset in the amount of the damages, which they contend were caused by the attachment of the excess gravel.

It must be borne in mind that the attachment was levied on February 3 and 8, 1961, and that following the execution of the agreement for assumption of the indebtedness by R. M. Crabtree on March 23, 1961, the court, upon motion of plaintiff, dissolved the attachment on May 3, 1961.

When the $65,000 loan was made to Plant on May 27, 1959, he executed a supplemental loan agreement which, after referring to the loan and the execution by him of the said note and the delivery of the nonnegotiable warehouse receipt for the 97,500 tons of washed gravel, stated:

"For the purpose of further inducing SBA to make said loan, borrower hereby represents, warrants to and agrees with SBA as follows:

"(1) That washed gravel represented by said warehouse receipt may be released to borrower by the Regional Director of SBA upon the payment by borrower of cash on the basis of one dollar for each ton of washed gravel so released. Payments so made shall be applied in payment, including principal and/or interest, on account of loan as evidenced by said note, and upon payment in full of loan, all funds received by SBA pursuant to the provisions of this paragraph, shall then be applied in payment of loan previously made to borrower by SBA designated by SBA as being loan No. ERDL–286, 819–DAL [referring to the loan of $20,000].

"(2) It is understood and agreed that borrower owns other gravel in addition to that represented by the warehouse receipt referred to above. Borrower agrees to furnish to SBA monthly duplicate copies of invoices of all sales of gravel made by him.

"(3) That any month in which sales of gravel by borrower shall exceed 3,700 tons, borrower will apply 35 cents per ton on each said ton in excess of 3,700 tons, upon said loan, it being understood that said SBA will apply payments so made in inverse order of maturity of the note evidencing loan. It is further understood and agreed that payments made in accordance with the provisions of this paragraph shall be in addition to the monthly installments called for under the terms of the note referred to above.

"(4) That default by borrower of any of the provisions herein shall entitle SBA to declare said note due and payable."

Between the months of October, 1960, and February 9, 1961, Plant sold 12,660 tons of gravel. He made no reports to the Small Business Administration of the sale and at the time the suit was filed was in default not only in his failure to make reports of the sale of gravel, but also in the payments due according to the terms of the notes. However, Plant claims that he entered into an agreement with the Tex Crete Company of Shreveport, Inc., about the 1st of October 1960, by which Tex Crete agreed to make an advancement of $10,000 to him if he could give a chattel mortgage on specific gravel in the amount of 50,000 tons. At the time the agreement was entered into between Plant and Tex Crete, he was in default in his payments to the warehouse company and also on the three loans sued upon. He was unable to meet the requirements of Tex Crete to obtain the advance. Mr. Plant also contends that the 50,000 tons upon which Tex Crete demanded a mortgage to secure the advancement was to be in addition to the amount which he was selling and daily shipping to Tex Crete, but one of the officials of Tex Crete said that the amount which was being purchased from day to day at that time did comprise a part of the 50,000 tons.

Mr. Plant further contends that he was unable to secure Tex Crete for the advancement because all of the gravel was situated on the Lewis lease of 28.2 acres,

and that the plaintiff refused to segregate the 97,500 tons. Therefore, he contends that he was prevented from selling the excess gravel and suffered the damage which he seeks to offset against the admitted indebtedness due the plaintiff.

A consideration of all of the evidence adduced, including the various exhibits, fails to convince the court that the defendants Plant and Crabtree suffered any damage by reason of the attachment on the excess gravel which, as heretofore stated, covered the months of February, March and April 1961. It was not incumbent upon the plaintiff to cause the 97,500 tons of gravel covered by the warehouse receipt to be segregated from the other gravel. The segregation of the gravel was a matter to be determined by the warehouse company, and apparently Mr. Plant did not demand of the warehouse company that the 97,500 tons be segregated, but notwithstanding the failure of Mr. Plant to receive the advancement from Tex Crete, the court does not believe that he suffered any damage since he admitted that he was in default at that time and that he had failed to account to the Small Business Administration for the gravel that he had sold and was selling.

In his plea for setoff Mr. Plant alleged that the excess gravel amounted to 250,000 tons, but a witness produced by Mr. Plant testified that in his opinion there was a minimum of 142,000 tons on the entire lease which, of course, included the 97,500 tons. In fact, the record shows that Mr. Plant paid a royalty of $3,240.00 on the basis of 3¢ per yard, or 162,000 tons which included the 97,500 tons. Therefore, the court holds that Plant has not sustained the burden of proof and has failed to establish that he suffered any damage as a result of any act of the plaintiff.

The court now reaches the question as to whether the defendant Puterbaugh by a mortgage executed by R. M. Crabtree and R. D. Plant on June 17, 1961, acquired a lien upon the excess gravel prior and paramount to any claim of the plaintiff, and in view of the facts heretofore set forth the court is of the opinion that the defendant Puterbaugh did acquire and now has a prior and paramount lien upon all the gravel situated on the Lewis lease in excess of the 97,500 tons covered by the warehouse receipt.

The remaining question is as to the amount of the indebtedness that the defendants Crabtree and Plant owe to the defendant Puterbaugh.

Mr. Crabtree contended that he should not be held liable for certain advances made by Puterbaugh and which were received by Plant, but all of the advances, while received by Plant, were used by him for the benefit of the joint business adventures of Crabtree and Plant, and the court is of the opinion that Crabtree is liable along with Plant for said indebtedness. There is no dispute that the amount of the indebtedness is $102,-784.71.

Therefore, judgment should be entered in favor of the plaintiff against the defendants, Robert D. Plant and wife, Lorrayne D. Plant, d/b/a Big Little Sand and Gravel Co., and R. M. Crabtree, for the amount of $120,112.61, with interest thereon to the date of the judgment; that a prior and paramount lien in favor of plaintiff to secure the payment of said indebtedness should be declared upon the machinery and other equipment described in the mortgages and upon 97,500 tons of washed gravel; that judgment should be entered in favor of the defendant Puterbaugh against the defendants, Robert D. Plant and wife, Lorrayne D. Plant, R. M. Crabtree and wife, Clara Crabtree, for the sum of $102,784.71, together with interest thereon to date of judgment, and that a first lien be declared in favor of the said Puterbaugh upon the property described in the mortgages sued upon including a first lien upon all gravel situated upon the Lewis lease of 28.2 acres except 97,500 tons of washed gravel covered by the warehouse receipt, and that a second lien be awarded subject to the lien of the plaintiff upon the said 97,500 tons of washed gravel in favor of the said Puterbaugh; and that the counterclaim of defendants, Robert

D. Plant and R. M. Crabtree, against the plaintiff should be dismissed.

The attorney for the plaintiff and the attorneys for the defendants will prepare precedent in accordance with the above, directing the foreclosure of the mortgages and the warehouse lien and the sale of property covered if judgments are not paid within 20 days from the date the decree is entered, and submit the same to the court for signature and entry.